Good afternoon, Your Honors. May it please the Court. My name is Kent Craybill on behalf of Petitioners. I plan to reserve five minutes at the end of my argument for rebuttal. That's fine. Thank you, Your Honor. This case is about the failure of the EPA to follow the procedure set up to assure the public of the validity of its reports and subsequent enforcement actions. This Court should vacate the report and the AOC because the EPA misled Petitioners and the public about the report being designated influential science and then failed to follow its own peer review procedure. Now, the report's lack of sufficient peer review and the EPA's attempts to hide the true nature of the report demonstrate that the report is… Counsel, I'm sorry to interrupt you so early, but on the point that the EPA, quote-unquote, attempted to hide, aren't there in the public record of the comments that were submitted to the agency explicit complaints about exactly what you're complaining about now? And I've read the public comments in the record. I think it's SER 80 at SEC and SER 207,248 at SEC. And they're complaining about exactly this. Why isn't your client charged with the knowledge in evaluating the statute of limitations issue here? Whatever statute applies, why isn't your client charged with the knowledge of what's in the public record in terms of these very explicit complaints that seem to me to mirror this argument you're making right now about supposedly misled us to influential science? Yes, Your Honor. Quite frankly, it's because of the way the EPA responded to the public. So the information was sought. The comments were made about the lack of peer review about the report being marked influential science, number one. And influential science, as Your Honors have already seen, requires a peer review. The peer review was not undertaken. It was partially undertaken. But when the farmers and others inquired about peer review originally, the EPA responded that an influential science peer review was completed. When that was done, the matter was dropped. And the farmers believed at that time that the peer review was done and that the science in the report was valid. Counsel, hold on. If we could back up on that timeline. Yes, Your Honor. When do your clients claim that they initiated that inquiry, sir? I'm sorry. Just so I'm clear, which inquiry, Your Honor? You mean when they first asked about the peer review? Right. Yes, that was back when the comments were asked for by the EPA, and they submitted comments about the peer review, as well as other peer reviewers and other entities also addressed the peer review. In response to that, the EPA put out their summary of response to comments. And in that summary response to comments, they said that it was done as influential science and the peer review was done. That was simply inaccurate. And we know that today. Fast forward to 2019 when my clients were implementing the AOC with the EPA and they were in a meeting with the AOC and they learned for the very first time that the peer review was not completed for influential science. Instead, that apparently the document was marked internally other forever. Counsel, even if the clock was told up until February of 2019, your clients didn't file until another year had passed. Isn't that right? That is correct, Your Honor. And we believe that's totally legitimate under the Safe Drinking Water Act statute of limitations. For the initial period, there's a 45-day statute of limitations. But when information is discovered past that 45 days, there is no limitation period. You seem to think there's no statute of limitation at all. No, that is incorrect, Your Honor. What is your position, please? Are you relying on the six-year theory under the EPA? How do you get there? What's your position? Sure, Your Honor. Let me walk through that a moment, if I may, on the statute of limitations issue. The statute of limitations, the argument that is made by the EPA is there's two primary arguments they make. First, there's a 45-day limitation on new claims arising after the new initial period. Second, there is a 45-day timeframe is jurisdictional, and thus the court uses jurisdiction after the 45-day period expires. But the language itself in the Safe Drinking Water Act and the case law interpreting that language demonstrate the EPA is wrong on both points. For the purposes of my question, if you could assume that I'm going to agree with you just so that we can narrow the issues, that it's a claim processing rule. Yes, Your Honor. Then under the Chevron versus EPA case in the Ninth Circuit, we are to look and see there are three potential opportunities that this panel could adopt. Number one is there could be no statute of limitations. The court said under certain circumstances, this court may conclude that there are no statute of limitations that should apply. But the Chevron court that said ordinarily they'll either find there's no limitations or they'll look at the most nearly analogous state or federal law. In Chevron, the court ultimately decided it didn't have to decide which ones it would apply because it was Chevron's own delay and no wrongful conduct by the government that was the problem. However, whereas here the agency directly misleads the citizens and that transgression causes the delay, the court should not protect the agency from review. Forever? Wait a minute. But this is the problem. I think if we construe everything in your client's favor, there was an aha moment in February of 2019. Yes, there was an aha moment because for the very first time in the history of this case, my clients learned that the report was actually designated other and other doesn't require peer review. So why wasn't there a 45 day period that was triggered in February of 2019? Well, because Congress did not did not include a 45 day period. This is what you were just getting there under Chevron. We certainly signaled that we would look to the most comparable. And why wouldn't the most comparable be the provision that that Congress provided for in the Safe Drinking Water Act? Well, because they didn't because Congress didn't provide the correct language under the QI Fund decision. The Supreme Court made it clear that to find it jurisdictional, you had to have the. But Judge Kristen has said, please assume that we're going to agree with you on jurisdiction and that it's a claim processing rule. So what we're looking at is the most analogous statute to take. And why wouldn't the most analogous statute to take either be, for example, the 45 days that Judge Kristen mentioned or 90 days from the Clean Water Act? Because of the conduct of the government. So you are empowered to look and either apply no statute limitations or borrow from the most nearly analogous. 45 days is unduly harsh, particularly where the government is misleading the public and my clients on this issue. It's it's that simple. If it is jurisdictional, then the government should be stopped from from relying on a 45 day bar to our clients. Their their conduct simply is not conduct that you would expect of the government. And then they turn around and say, gotcha. On the 45 days, they waited years to disclose that that report was marked other had that report been marked other. And we didn't. And my clients didn't know that there was a bulletproof, conclusive finding that they caused elevated nitrates in the soil. They would have never entered the AOC. What is your best argument that the report is final agency action? One second, your honor. Well, your honor, as you know, the test is for agency action to be final, is that the action must mark the consummation of the agency's decision making process and not be merely tentative or interlocutory. And second, it must not be. It must be something from which legal consequences flow here. The report marks the consummation of the EPA's decision making process. Within the report, the EPA details the investigative steps to evaluate nitrate levels in the groundwater. It's investigated steps it took and potential sources of groundwater contamination. It went through a draft process. It went through a review period, although deficient. And then they produced what was called a final report. In fact, the EPA argues on page 42 of its response that the draft of the report even removed the word likely because the EPA had made a final decision about the dairy's ultimate responsibility for the presence of nitrate in the groundwater. And so doing, the report constitutes EPA's decision making on the cause of the alleged nitrate problem. Thus the report is what this circuit has called previously the last word on the validity of the nitrate levels in Yakima. And as such, it is a reviewable agency action. It is expressly not the last word. It contemplates further action, doesn't it? I don't want to get into it and use a lot of your time on a back and forth, but if you want to tell me which ER site you would like me to look at for your strongest contention, that you think that report constitutes final agency action, that might be the most efficient way to proceed. So I make sure I don't miss your point. I read it, but I'm giving you an opportunity because I read it quite to the contrary. Sure, sure, your honor. I would say, and I understand there are tentative parts of the report. But if you look at the report, it says in itself, they took out the word likely. And it says that my clients are the ones responsible for the nitrates in the groundwater. There's nothing else to be done. That's that's I would say response brief at 42. Are you looking at the report? At the response brief at 42, your honor. Thank you. Yes. I wanted to add, your honor, for the consummation of decision making. I also we also believe that the APA that it's that it's actually a rule or order under the APA. The APA defines a rule as the whole or part of an agency statement of general or particular particular applicability in future effect designed to implement, interpret or prescribe law or policy. And the report on its face, at the very least, is part of the EPA statement of the applicability and effect of the Safe Drinking Water Act on petitioners dairy operations. And as you know, the report even tracked the rulemaking procedure of the APA and it was posted for public comment and it received comments and then adjusted that and then came out with the final rule. And finally, like I said, took out the likely and put in that my clients or the dairy clusters cause the elevated nitrate levels. Alternatively, I believe it also could be reviewable as an order. The report is at least part of a final disposition of a matter, specifically the investigation of alleged contamination and the findings that the dairy clusters caused it. You want to discuss the standing issue? Yes, your honor. I don't. I believe that the standing issue. And one second, please. They make they make they make an argument about standing. However, I do want to say the court should note that even if the court applies a defense, it would not dispose totally of the petition on the standing issue. First, it's a waiver would only bar the petitioners claim against the AOC and not against the report. And second, the EPA only claims that Petitioner Western State Dairy Federation, not the other petitioners, lacks any of the challenge that the AOC. As to the waiver argument. Sorry, I didn't ask a good question, I guess. I'm aware that the standing argument only pertains to one of the parties. But what is your response to the standing argument, please? Oh, yeah. On Western State Dairy Federation, they argued that because they didn't sign the AOC, that they lacked standing to challenge it. But they have standing both on their own and in a representative capacity. The AOC enters several findings of fact connecting the dairy industry in Washington to increase nitrate levels. Additionally, the AOC concludes without petitioner's consent that members of the Western State Dairy Federation are potential sources of increased nitrate, nitrate levels and forces members of Western State Dairy Federation undertake several extensive and burdensome remedial measures. As described above, the AOC is a direct result of the EPA's arbitrary and capricious action beyond the scope of its jurisdiction. Thus, Western State Dairy Federation has suffered actual concrete injury that is traceable to EPA's wrongful conduct. Additionally, they have representational standing, representative standing. They exist to develop and promote initiatives directed toward the financial strength, political support and public awareness of the industry. Challenging illegal government action is adverse to Washington dairies is germane, directly germane to the WSDF's purpose. In fact, members include the petitioner itself, Cal Palace, but also non-petitioner dairy signatories of the AOC, such as DNA Dairy LLC, George and Margaret LLC and Liberty Dairy LLC. Thank you, sir. Did you want to save your time for rebuttal? Yes, I'll reserve the remainder of my time. Could I just ask a clarifying question to circle back to the timeliness? So I just so that I understand you correctly, even if we go with you saying that the disclosure in February 2019 was the key event, you're saying that under Chevron, there is we cannot find and there is no analogous statute of limitations or statute that we should look at. And so we are compelled because of what the government did in not disclosing it earlier that we have to say there's no statute of limitations. Is that your position? I just wanted to clarify that. Thank you, Your Honor. Yes, either there is you have the ability under Chevron to either say there's no statute of limitations or to apply the 45 day or six month statute of limitations from the APA. We suggest that you either apply none or the six year statute of limitations, which would not bar my clients. And the reasons we're asking for that is because of the circumstances of the case where the government misled my clients. All right. Thanks. We'll hear from the government, please. Good afternoon. My name is Daniel Pinkston. I'm an attorney with the Environment Division of the U.S. Department of Justice. And I'm representing the respondents in the case. I want to focus just on a couple of issues, obviously responding to questions as they're asked. But the first issue I wanted to focus on was the statute of limitations argument, which we believe should dispose of this case without further ado. First of all, we have made the argument in our brief that the statute of limitations included in Section 300J-7 is jurisdictional. And under including under the language of the QIA fund long case, because that section of the Safe Drinking Water Act is concerned with jurisdiction. The Supreme Court in the QIA fund case said, look, if you just have a process provision with no tying it to jurisdiction, then that is not a jurisdictional requirement meeting that statute of limitations. But when you look at this, the section is titled judicial review. And in the section itself, there's a provision that says action of the administrator with respect to which review could have been obtained under the subsection shall not subject to judicial review and similar enforcement actions. The point is that the language of 300J-7 is shot through with jurisdictional language. The 45 day period is a jurisdictional bar and under QIA fund. And if we disagree, then what? Well, if you disagree, the case still has to be dismissed because assuming even if you assume that it's not jurisdictional, the language of the statute means something. And if, as the petitioners claim, and we don't I don't necessarily agree with this, but if they claim that the first time they knew that the report was internally classified was other was February of 2019, as has been pointed out already, they waited a year before they filed their petition. They claim more than that. They claim they were affirmatively misled. I think that's what opposing counsel would say about that, that they were affirmatively misled and they inquired and they didn't know until I think February of 2019. Well, first of all, as we indicated in our brief, and I'd be happy to talk about the idea that they were somehow affirmatively misled. We don't accept that. But saying that was the case. Say that the statute of limitations provision is not jurisdictional and it would be subject to some kind of equitable tolling. Well, if that was the case, the equitable tolling can only go until they find out what it was they claim was concealed from, which by their own in their own briefing, they say it's February of 2019. Even if that was the case. So at that point, you're saying 45 days, they had 45 days. If we agree that it's told until February of 2019, what is the government's position as to the time limit, if any, that they had to file? Well, it's as we laid this out in a brief, and it is clearly the 45 days that's in the initial statute of limitations. Let me explain why I say that. First of all, in the HRI case that we cite from the 10th Circuit, this very question is dealt with. Now, it's not binding on this court, of course, but the rationale makes a lot of sense. Why would it be the case that Congress says you have 45 days after a final agency action to file a petition? But if something arises later, you have until the Trump sounds in heaven to file something.  As indicated in the Chevron USA case, you look at the most analogous statute of limitations, and clearly that is the 45 days which is given with regard to initial claims. It would be irrational to assume that Congress thought that, okay, we want to cabin this, we want to call this 45 days, but if it comes after that, it's whatever time it takes. It just does not make any sense. If the statute is not jurisdictional, and you can consider equitable tolling principles, the tolling has to end on February of 2019. Other courts have explicitly said it's 45 days. The rationale, looking at the Clean Water Act in the Chevron case, is the same basic theory. Excuse me, I didn't mean to interrupt you. You just said other courts have explicitly held, and I just want to make sure that you don't know something that I don't know. I'm only aware of courts answering that question that did not have the benefit of the Supreme Court's most recent guidance on what is the difference between a claim processing rule and a claim processing act. Is there something more recent? No, there isn't. Let me explain why that doesn't make a difference if I can. The HRA case was pre-QI Fund, but QI Fund talks about whether or not the statute of limitation is jurisdictional. We are talking about not whether it's jurisdictional or not, but if the statute in this particular case has a portion of a set of circumstances where someone might bring a claim, what should the statute of limitations be in that particular circumstance? That's not what QI Fund was about. I understand that, sir. I think you've answered my question. All right. I probably do not need at this point to go through all the rationale about why we think it's jurisdictional. I started to mention that within the meaning of QI Fund, this particular section talks about jurisdiction. This is the jurisdictional section of the Safe Drinking Water Act. That being the case, this 45-day period is jurisdictional. If it is jurisdictional, as we contend, that means that equitable tolling principles and so on have no effect. Again, even if it's not jurisdictional, this petition must be dismissed because it didn't meet the 45-day period. I would then move on from that point to the question of whether or not state and local officials had acted. That's one of the requirements in the 300I Emergency Powers Provision of the Safe Drinking Water Act. It says that if there is imminent and substantial endangerment, there's a contaminant, and state and local officials have not acted to ameliorate the problem, then EPA can undertake emergency measures. We would contend that EPA reasonably found that there was no state and local action which would have led to addressing the problem that EPA did address in the administrative order on consent. The record is peppered with findings by EPA that there was no action being undertaken by any state or local entity which was going to be anywhere equivalent in either content or time as was required under the AOC. There's one particular provision or memorandum that's in the record. It's a memorandum where the author at EPA goes through all of the different meetings, consultations that it's undertaken with these various state and local authorities, and not one of them said, we're going to do what you're going to do. That being the case, and given the deference that should be afforded to EPA in considering that question, and as the Trinity American case says, it's EPA's determination whether or not state and local officials are doing enough. There's enough in the record here to say that was not happening, and even in looking at the particular things cited by the petitioners, neither of the programs that they cite rise to the level of being sufficient to take care of the problems that's facing us here. One was the initial, back in 2011 I think it was, there was an activity where there was some screening that was done and some testing strips were handed out and so on. We discussed it in our brief. That activity ended in 2011. The second thing that they cite as constituting some kind of action sufficient to prevent EPA using its emergency powers in the groundwater management area, which is a program under the Washington state law. But that program, number one, they've not come forward with anything to show that the activities undertaken pursuant to the groundwater management area are doing anything to take care of the acute problem that EPA has identified and is taking care of through the AOC. Council, the panel is interested in hearing about final agency action and about standing. Could I get you to address those topics, please? Certainly. The report is, I say clearly, but maybe that's an overstatement, but the report is not final agency action. And that's, in the discussion from council about that earlier, left off the second part of the test. The second part of the test is in this action, whatever it is, are there legal consequences that flow from the purportedly final agency action? There aren't in the report. The report itself says, to begin with, the report says, evaluating actions to reduce nitrate concentrations in residential drinking water to safe levels is beyond the scope of this report. It's page 130 of the excerpts of record. There's nothing in the report that says that liability will be imposed on anyone, that any actions will be required of anyone, that there is any danger that anyone is in because this report in and of itself has been issued. That's not the case. The report is not self-executing to make anybody do anything. And in this particular case, these petitioners could have easily just said, look, I don't want to enter into an administrative order of consent. I don't like what you put in the report. I don't think it's sufficient. Come after me. That's not what happened. If I could point to, there's a letter from council from the petitioners that's in the record. It's supplemental excerpts of record 122. It's a letter from council for some of the dairies. And that was Foster Pepper and Perkins Cope. This is not people out there pro se defending themselves against the government. But in this letter, from the council for the petitioners to EPA, it states, to be clear, our clients have an unequivocal desire to provide alternative water supply, apply source control measures, and conduct groundwater monitoring. Those actions must take place in the context of a reasonable bilateral agreement with EPA. That's from November 9th, 2012, several months before the AOC became effective. They knew what was happening here. To get back to the finality issue, again, there is nothing in the report, which is clearly in and of itself, it doesn't pretend to be totally complete. As a matter of fact, one of the major portions of the AOC has to do with the requirement for additional monitoring by the dairies who signed up to it. So, number one, it's not the final word on this problem. Number two, it didn't cause any kind of legal consequences. This is not the Sackett case. The petitioners could have put the government on its proof, but for whatever reason, they decided that they wanted to enter into the AOC, which I would suggest was a public-spirited thing to do. But now they come back and complain seven years later. Oh, wait a minute. In the end, though, because finality in the Ninth Circuit in an APA case is jurisdictional, then because the report is not final agency action, that portion of the petition for review must be dismissed. On the standing point, we noted in our brief that there were no standing allegations in the brief that Washington State Dairy Federation was one of the sponsors of. And one of the requirements in the standing analysis is whether or not the petitioner has shown that it has standing. In this case, because Washington State Dairy Federation did not sign the AOC, certainly was at no risk of any legal liability because of the existence of the report, it has to come forward and show either associational standing or standing on its own. And there was nothing in the opening brief that dealt with that. So we called them on it. I wouldn't necessarily suggest that what they came back with is sufficient to show standing. And we don't dispute the standing of the petitioners who signed the AOC here. But it's pretty attenuated standing. We understand the case can go forward even without Washington State Dairy Federation. But as a matter of pleading, they didn't do what they were supposed to do. We said you should. They came back with something which may or may not be sufficient. But that's where we are on the standing issue. Is your position at this point that it is sufficient or not sufficient, sir, as organizational standing? There are no... Well, I take it back. There was a declaration in the reply brief that goes to this. Your Honor, I think we would say that they may have made a colorable claim of standing in this case, but that it is not a particularly relevant issue. I mean, of course it is because they're a petitioner in this court. But we don't think that they came forward with what they needed to come forward. Certainly not what we see in other cases when someone's coming in and trying to show associational standing in a case like this. Thank you. Let me just make sure my colleagues have a chance to get in a word. Edgewise, do you have questions? I do not. Thank you. Anything further from the government? Your Honor, I think we have made our points here. I mean, I guess I could speak for a minute about the issue of whether or not the report was, quote, other or whether it was influential. First of all, as we point out in our brief, in the science inventory the EPA maintains, this report is publicly available. It's always been denominated as other. That's out there. Secondly, it's important to, as I think some of the initial questioning brought out, the peer review process that did occur here was transparent. And the petitioners and other parties who were interested in the report were given copies of the peer review documents. And they commented on those to great length. And were very critical of the peer review that did occur. So that can't be denied. The petitioners can't come in here and say, well, we didn't know what was going on with the peer review. Because they commented on it months before they signed up to the AOC. And another point that's of importance here is that whether or not this report is denominated as other or influential has no significance to whether or not the report was adequately supported. EPA gave the report, with one exception which we note in our brief, the peer review it would have gotten if it had been called internally an influential document. There's nothing more that would have happened. And it's strange credulity to believe that these sophisticated petitioners, the sophisticated council, decided that they would enter into the AOC because EPA said, this is influential and we have a bulletproof case against you.  But taking it on its face. And the only allegations about that come from a declaration by Petitioner Adam Dolson, which was attached to their opposition to our motion to dismiss. Where he says in that declaration, he doesn't say who told him that it was influential. He doesn't say who told them that the EPA case was bulletproof. Which is obviously puffery if it even happened. And he says, well I heard that other... I'm sorry, what's obviously puffery? If someone at EPA said, hey our case against you is bulletproof. In the context of negotiations for an AOC. Thank you, I understand what you mean now. All that being the case, simply the factual background to this question of supposed fraudulent inducement is just not there. It's not part of the administrative record in any case. And when you look at the Washington State requirements for showing fraud and inducement, it's a nine part test. And it just hasn't been shown to you. These are sophisticated petitioners. They saw the report. They commented on it at great depth. They commented on the peer review process. And yet for their own reasons, they decided to go forward with the administrative order on consent. And they also signed up to the agreement not to waive judicial review. For all these reasons, your honor, we think that... To the court, we believe that the case must be dismissed for failure to meet statute of limitations. Counsel, you're over your time. That's why that light's flashing. I'm going to cut you off there. Thank you. Thank you for your argument. Thank you. We'll hear from the opposing counsel. You've reserved about three and a half minutes, sir. Yes, your honor. Quickly. I have to wonder, Mr. Pinkston said it doesn't matter if influential science... ...or other, that the peer review had been done. But I just... The peer review was not done. In fact, Mike Cox of the EPA said that it would take a lot of work at the last minute to change it over to influential science talking. What we have here is the government with one hand internally marketing the other. And on the other hand, publicly, they're saying influential science in this large peer review was done. And it wasn't. A partial peer review was done. Secondly, your honor, I believe you asked me for a citation on misrepresentations. And in volume three of our initial experts at 486, the EPA's response on the peer review issue. And then also the seven documents attached to our first and second motion to supplement. And then also on the final agency action you asked me about, your honor. I asked what page of the report you're referring to where you think there's support for final agency action determination as to the report. Yes, your honor. And that's SER0016, which is the summary and conclusions. And it's where they indicate that it said likely previously, but they took out the likely. And now it says the new data demonstrate that the dairies are a source of nitrate contamination to the groundwater beneath and downgrading of these dairies. So that would be that. The EPA documents reveal a story of a rush pro forma treatment of the report and peer review process. Here's what we know. EPA originally treated the report as influential. It intended to have four to ten peer reviewers. By late 2011, it only secured two. One later asked to be removed because the underlying data was not completely given to it. The EPA posts the report for comment. It received comments. It then adjusted and responded to those comments. In December 2012 and 2013, the EPA collected new data. Because the existing data was not helpful and there were, quote, quality control issues at the laboratory, end quote. However, your honors, that new data was never itself subject to peer review or public comment. And in November 2012, Gina Greco-Grove, EPA quality assurance manager, wrote that we never paid attention to peer review until about a month ago. In March 2013, when it came time to respond to the public comments, the EPA defended its peer review approach for influential science. And this is in the documents that are all attached to our first and second motion to supplement. But they show behind the scenes they were playing games with what they remarked and they never told the public that this was an other report. Had they done so, my clients would not have thought the same about the conclusiveness of the report and they would not have entered the AOC. For those reasons, we believe the government acted in an arbitrary and capricious manner. They did not give reasoned responses to the comments. And therefore, we're asking this court to vacate the report and the AOC and to remand to the EPA for action accordingly. Thank you very much. Thank you. Any further questions by members of the panel? No, Judge Kristen. Thank you. No, thank you. All right. Thank you. And thanks both counsel for your arguments. They were very helpful. We'll take this matter under advisement and we'll stand in recess for today. Thank you.
judges: Christen, Kobayashi, Bennett